## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| NANOGEN, INC. et al.,[1] | ) Case No. 09-11696 (____) |
| | ) |
| Debtors. | ) (Joint Administration Pending) |
| | ) |
| | ) **Bidding Procedures' Objection Deadline: TBD** |
| | ) |
| | ) **Bidding Procedures' Hearing Date: TBD** |
| | ) |
| | ) **Sale Objection Deadline: TBD** |
| | ) |
| | ) **Sale Hearing Date: TBD** |
| | ) |

**MOTION OF THE DEBTORS FOR ENTRY OF (I) AN ORDER (A) APPROVING BID PROCEDURES; (B) AUTHORIZING AND SCHEDULING AN AUCTION; (C) APPROVING PAYMENT OF A BREAK-UP FEE AND EXPENSE REIMBURSEMENT; (D) ESTABLISHING PROCEDURES RELATING TO THE ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES, INCLUDING NOTICE OF PROPOSED CURE AMOUNTS; (E) APPROVING THE FORM AND MANNER OF NOTICES; AND (F) SCHEDULING A SALE HEARING; AND (II) AN ORDER OR ORDERS AUTHORIZING AND APPROVING (A) THE SALE OF SUBSTANTIALLY ALL OF DEBTORS' ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS AND ENCUMBRANCES AND (B) THE ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES IN CONNECTION THEREWITH**

Nanogen, Inc. ("Nanogen") and its affiliated debtors and debtors-in-possession (collectively, the "Debtors"), hereby file their motion (the "Motion") pursuant to sections 105(a), 363, 365, 503 and 507 of title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (as amended, the "Bankruptcy Code"), and Rules 2002, 6004, 6006 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), seeking entry of:

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Nanogen, Inc. (9621), Epoch Biosciences, Inc. (1592) and Nanotronics, Inc. (9618). Addresses for the Debtors can be found in the Debtors' petitions, which are available at http://www.bmcgroup.com.

(i)        an order, substantially in the form attached hereto as <u>Exhibit A</u> (the "<u>Bid Procedures Order</u>") (a) approving certain bid procedures, which are attached as <u>Exhibit 1</u> to the Bid Procedures Order (the "<u>Bid Procedures</u>"), in connection with the sale (the "<u>Sale</u>") of substantially all of the Debtors' assets generally described as follows: (i) Molecular Diagnostics Business (which includes the stock of "NAD", the assets of "Epoch", the "MDx IP," and certain assets of Nanogen that are used primarily in the conduct of the Molecular Diagnostics Business), (ii) Point of Care Business (including the "Cardiac Point of Care Business" and the "NeXus Dx Point of Care Business"), and (iii) the Additional IP Assets (as each such term is defined below) in one transaction (the assets to be sold pursuant to the Purchase Agreement (defined below) and this Motion are collectively referred to herein as the "<u>Purchased Assets</u>"); (b) authorizing and scheduling an auction (the "<u>Auction</u>") in connection with the Sale; (c) approving the payment of a break-up fee (the "<u>Break-Up Fee</u>") to Financiere Elitech SAS ("<u>Elitech</u>" or the "<u>Stalking Horse Purchaser</u>") and the reimbursement of Elitech's reasonable out-of-pocket expenses not to exceed $500,000.00 (the "<u>Expense Reimbursement</u>"), in each case in accordance with the terms and conditions of the Purchase Agreement (as defined herein below) pursuant to which Elitech has agreed to acquire the Purchased Assets; (d) establishing and approving the procedures to determine, and the form and manner of notice with respect to, the amounts to be paid and actions to be taken to cure defaults, if any, under the executory contracts and unexpired leases to be assumed by the applicable Debtor and assigned to the successful bidder in connection with the Sale; (e) approving the form and manner of notices of the proposed Sale, the Bid Procedures, the Auction and the sale hearing; and (f) scheduling a hearing (the "<u>Sale Hearing</u>") to consider approval of the Sale; and

(ii)    an order, substantially in the form attached hereto as <u>Exhibit B</u> (the "<u>Sale</u> <u>Order</u>") authorizing and approving: (a) the sale of the Purchased Assets to the Stalking Horse Purchaser, or the person(s) or entity(s) making an otherwise higher and better offer at the Auction, free and clear of liens, claims and encumbrances, for all of the Purchased Assets; and (b) the assumption and assignment of the executory contracts and unexpired leases to be assumed by the applicable Debtor and assigned to the successful bidder in connection with the sale.

The facts and circumstances supporting the entry of the Bid Procedures Order and the Sale Order sought by this Motion are set forth in detail below and in the Declaration of David Ludvigson in Support of Debtors' Chapter 11 Petitions and First Day Relief (the "<u>Ludvigson</u> <u>Declaration</u>"). In further support of this Motion, the Debtors respectfully state as follows:

## JURISDICTION

1.    The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue is proper in this District and before this Court pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory predicates for the relief requested herein are sections 105(a), 363, 365, 503 and 507 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, 6006 and 9014.

## THE DEBTORS' ASSETS SUBJECT TO SALE

2.    On the date hereof (the "<u>Petition Date</u>"), each of the Debtors filed a voluntary petition for relief under chapter 11 of title 11 of the Bankruptcy Code. The Debtors continue to operate their businesses and manage their properties as debtors in possession under sections 1107(a) and 1108 of the Bankruptcy Code. No request for appointment of a chapter 11 trustee or examiner has been made and, as of the date hereof, no official committee has been appointed.

3.    The Debtors operate primarily through two business segments. The Molecular Diagnostics Business consists of all the operations carried on by the Debtors up to the date

hereof and assets including products, components, regulatory filings, contracts and intellectual property associated with the development, production, distribution and sale of products relating to research and diagnostic testing based on amplification and detection of nucleic acid carried out by Nanogen, Nanogen Advanced Diagnostics, S.r.l. ("NAD"), a wholly-owned subsidiary of Nanogen that is organized under the laws of Italy, and Epoch, including the product lines Q-PCR Alert and PCR Alert (the "Molecular Diagnostics Business"). The largest medical application for the Debtors molecular diagnostic products is for use in identifying viral infection in transplant and immunocompromised patients. At the core of the Molecular Diagnostics Business is the Debtors' proprietary Minor Grove Binder Technology ("MGB"). The MGB is a technology family comprised of unique designs, intellectual property and related components that are incorporated in the Debtors' in vitro diagnostics products or licensed to the Debtors' customers (collectively, the "MDx IP"). Using its MGB technology, the Debtors have developed two real-time polymerase chain reaction molecular product lines: Q-PCR Alert, developed and produced at a facility in Turin, Italy and MGB Alert, developed and produced at facilities in Bothell, Washington and San Diego, California. The Q-PCR Alert products are sold under a license from F. Hoffman-La Roche Ltd. ("Roche"). The MGB Alert products are sold as analyte specific reagents ("ASRs") and used for the diagnosis of infectious diseases. The Debtors' MGB Alert products are distributed under a non-exclusive distribution agreement with Fisher Scientific. The Debtors also produce and sell MGB products and components as research products to customers conducting research or product development activities. The Debtors operate the Molecular Diagnostics Business through Nanogen (in San Diego, California), Epoch (in Bothell, Washington), and NAD.

4.     The Debtors' Point of Care Business consists of all the operations carried on by Debtors up to the date hereof and assets including products, components, regulatory filings, contracts and intellectual property associated with the development, production, distribution and sale (whether such activities are being carried out at a Debtors' facilities located in Toronto, Canada, San Diego, California or elsewhere) of rapid qualitative tests for cardiac markers, rapid quantitative tests for cardiac markers, rapid tests for infectious disease, or other rapid testing, including intellectual property associated with stroke, traumatic brain injury and other diseases; the Vyent, Cardiac STATus and Decision Point product lines and the NeXus Dx platform including the Contract with the United states Centers for Disease Control and Prevention for development of a rapid influenza test (the "Point of Care Business"). The Debtors operate the Point of Care Business through Nanogen and Nanogen Point of Care, Inc. (a non-debtor organized under the laws of Ontario, Canada). The activities of Nanogen Point of Care, Inc. have been significantly reduced in light of the Debtors' financial constraints

5.     In addition, the Debtors own rights in intellectual property not used in connection with either the Molecular Diagnostics Business or the Point of Care Business. Specifically, the Debtors own patents and proprietary technology related to electronic microarrays, nanotechnology fabrication, other nanotechnology methods and various other applications (collectively, the "Additional IP Assets").

6.     Additional factual background relating to the Debtors generally, including their corporate structure, business operations, the circumstances leading to the filing of their bankruptcy cases and their existing indebtedness, is set forth in detail in the Ludvigson Declaration filed concurrently herewith and fully incorporated herein by reference.[2]

---

[2]     All capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Ludvigson Declaration.

## RELIEF REQUESTED

7.      By this Motion, the Debtors respectfully request entry of the Bid Procedures Order in substantially the form attached hereto as Exhibit A: (a) approving Bid Procedures in connection with the Sale of the Purchased Assets to Elitech; (b) authorizing and scheduling the Auction in connection with the Sale; (c) approving the payment of the Break-Up Fee and the Expense Reimbursement to the Stalking Horse Purchaser, in each case in accordance with the terms and conditions of the Purchase Agreement pursuant to which Elitech has agreed to acquire all of the Purchased Assets for $25.685 million; (d) establishing and approving the procedures to determine, and the form and manner of notice with respect to, the amounts to be paid and actions to be taken to cure defaults, if any, under the executory contracts and unexpired leases to be assumed by the applicable Debtor and assigned to the successful bidder in connection with the Sale; (e) approving the form and manner of notices of the proposed Sale, the Bid Procedures, the Auction and the Sale Hearing; and (f) scheduling the Sale Hearing to consider approval of the Sale of all of the Purchased Assets to Elitech, or the person(s) or entity(s) making an otherwise higher and better offer at the Auction in accordance with the Bid Procedures Order.

8.      Following the Auction, and at the Sale Hearing, the Debtors will seek entry of a Sale Order approving: (a) the sale of the Purchased Assets free and clear of all Encumbrances (as defined herein) to Elitech or the person(s) making a higher and otherwise better offer to acquire the Purchased Assets, pursuant to the terms of the Purchase Agreement, substantially in the form attached hereto as Exhibit C; and (b) the assumption and assignment of the executory contracts and unexpired leases to be assumed by the applicable Debtor and assigned to the successful bidder in connection with the foregoing sale.

### A.     The Proposed Sale

9.      In April 2008, the Debtors retained Cowen & Company, LLC ("Cowen") as their investment banking firm to assist the Debtors in exploring various strategic alternatives, including a potential sale or restructuring of the Debtors' businesses.   The Debtors, in consultation with Cowen and their other professionals, considered a number of potential sales and restructuring alternatives to develop a plan that would maximize value for their creditors and to ensure the Debtors' long-term survival.   Consistent with this approach, the Debtors established an on-line data room (the "Data Room") in January, 2009.   After carefully considering their options, and in light of their liquidity constraints and financial deadlines and restrictions, the Debtors determined that the best course of action to obtain the greatest possible return for their stakeholders was to seek both a buyer for the entirety of the Debtors' businesses as a going concern, and evaluate the potential sale of the Debtors' various assets separately. After lengthy arms' length negotiations that process resulted in the execution of the Purchase Agreement with Elitech to acquire the Purchased Assets.   Although during this process the Debtors and their advisors engaged in discussions with numerous parties interested in separately purchasing either all or portions of the Point of Care Business, all of the assets (as opposed to the stock) of NAD, and various components of the Molecular Diagnostics Business, the Debtors concluded the Purchase Agreement represents the highest and best transaction.

10.     The Debtors believe the floor established by the Purchase Agreement, subject to higher and better bids pursuant to a Bankruptcy Court-approved, open auction process pursuant to section 363 of the Bankruptcy Code, affords the Debtors the best opportunity to maximize value for their creditors and their estates.

## B.    The Purchase Agreement With Elitech

11.    On May 13, 2009, the Debtors and Elitech entered into the Purchase Agreement pursuant to which Elitech will acquire all of the Purchased Assets and assume certain liabilities of the Debtors, as more fully set forth in the Purchase Agreement. The Purchased Assets are more particularly defined and described in the Purchase Agreement. The Purchase Price (as defined in the Purchase Agreement) agreed to be paid by Elitech for the Purchased Assets is $25,685,000.00, of which amount the outstanding indebtedness owed to Elitech by Nanogen as of the date of the Purchase Agreement of $4,175,987.00, will be credit bid by Elitech in accordance with the terms of the Purchase Agreement. The Debtors shall satisfy any outstanding cure amounts, as may be determined by the parties or the Bankruptcy Court, with respect to any executory contracts and unexpired leases to be assumed and assigned pursuant to the Purchase Agreement, from the proceeds of the Sale and either satisfy such cure amounts at Closing or reserve, in a separate escrow account, sufficient funds, free and clear of all liens, claims and encumbrances, necessary to satisfy such cure amounts.

12.    In order to make a single bid for all of the Debtors' Purchased Assets, Elitech has entered into an agreement with The Bay City Capital Fund V, L.P. (together with its affiliated entities, "BCC") pursuant to which BCC will finance a portion of the Purchase Price and receive concurrently (as an assignee of Elitech under the Purchase Agreement) and/or immediately subsequent to the Sale: (a) title to certain of the Purchased Assets; (b) license to use certain of the Purchased Assets; and (c) assignment of certain executory contracts and unexpired leases of the Debtors. Notwithstanding the foregoing, Elitech remains obligated to pay the full amount of the Purchase Price for the Purchased Assets.

13. Immediately prior to the Petition Date, the Debtors and their professionals were in active discussion with numerous parties interested in the Debtors' assets, and seventeen (17) parties had been granted access to the Data Room. The Debtors and their professionals intend to continue to aggressively solicit potential purchasers for the Debtors' businesses and assets in accordance with the Bid Procedures and the Purchase Agreement. In light of the Debtors' lack of liquidity and other financial constraints, the Debtors intend, consistent with their obligations under the Purchase Agreement, to execute their plan of pursuing the sale of their businesses and assets as promptly as practicable, in accordance with the provisions of the Bankruptcy Code and in a manner that will afford all of the Debtors' economic stakeholders an opportunity to participate in the process and otherwise maximize the value of the Debtors' assets for the benefit of all creditors.

14. The Debtors seek an expeditious, yet appropriate, schedule whereby a hearing on the sale of the Purchased Assets may be held and completed within a period of approximately forty (40) days from the Petition Date. The need for this schedule is underscored by the Debtors' lack of liquidity and inability to attract and secure financing. Moreover, such a schedule will ensure the preservation and maximization of the value of the Purchased Assets. Any material deviation from the requested schedule may result in the deterioration of the value of the Purchased Assets, and the Debtors' inability to access and use cash collateral.

C. **Proposed Bid Procedures—Local BR 6004-1 Disclosures**[3]

15. Although the Debtors have undertaken extensive efforts prior to the Petition Date to market their businesses and assets to ensure they are exposed to the broadest pool of possible purchasers and to ensure the highest possible price is received, the Debtors believe that it is

---

[3] As noted below, to facilitate the Bid Procedures, the Debtors respectfully request that the Court schedule the Sale Hearing at the convenience of the Court, no later than the week of June 22, 2009 and set the Bid Deadline and Auction in advance thereof.

imperative that they promptly move forward with the approval and implementation of the Bid Procedures. Accordingly, the Bid Procedures (as summarized below) were developed consistent with the Debtors' need to expedite the sales process, but with the objective of promoting active bidding that will result in the highest and best offer the marketplace can sustain for the Debtors' assets. Moreover, the Bid Procedures reflect the Debtors' objective of conducting the Auction in a controlled, but fair and open, fashion that promotes interest in the Debtors' assets by financially-capable, motivated bidders who are likely to close a transaction.

16.    The following paragraphs in this section summarize only the key provisions of the Bid Procedures, and are qualified in their entirety by reference to the actual Bid Procedures attached as <u>Exhibit 1</u> to the Bid Procedures Order.

## BID PROCEDURES

### Bidding Process

The Debtors, in consultation with the representatives of the Official Committee of Unsecured Creditors (the "<u>Creditors Committee</u>") and Portside Growth and Opportunity Fund, as collateral agent to various secured parties (the "<u>Lender</u>"), will:

(a)    determine the steps to be completed, and the timing in respect of such steps, for the marketing and sale of the Purchased Assets;

(b)    determine whether any person is a Qualified Bidder (as defined below);

(c)    determine whether a Qualified Bidder has made a Qualified Bid (as defined below); and

(d)    negotiate any offer set forth in a Qualified Bid,

(collectively, the "<u>Bidding Process</u>").

### Participation Requirements

Unless otherwise ordered by the Bankruptcy Court, in order to participate in the Bidding Process, each person (a "<u>Potential Bidder</u>") must first deliver to: (i) Nanogen, Inc., 10398 Pacific Center Court, San Diego, CA 92121, Attn: David Ludvigson; (ii) counsel to the Debtors, Ashby & Geddes, 500 Delaware Avenue, 8th Fl., Wilmington, DE 19801, Attn: Bill Bowden, Esq. and Ricardo Palacio, Esq.; and (iii) Cowen & Company, LLC, 1221 Avenue of the Americas, 14th Floor, New York, NY 10020, Attn: Mark Secrest (collectively, the "<u>Notice</u>

Parties"), no later than 5:00 p.m. (Eastern Time) on May __, 2009, the following items (the "Participation Requirements"):

(a) <u>Confidentiality Agreement</u>: An executed confidentiality agreement (unless previously delivered) in form and substance reasonably acceptable to the Debtors; and

(b) <u>Proof of Financial Ability to Perform</u>: The most current audited and latest unaudited financial statements of the Potential Bidder, or, if the Potential Bidder is an entity formed for the purpose of making a Bid, the current audited and latest unaudited financial statements of the equity holder(s) of the Potential Bidder or such other form of financial disclosure evidencing the Potential Bidder's ability to close the proposed sale transaction, the sufficiency of which shall be determined by the Debtors in their discretion in consultation with the Creditors Committee and the Lender.

## Access To Due Diligence Materials

Upon a Potential Bidder's satisfaction of the Participation Requirements such Potential Bidder shall be deemed a "<u>Qualified Bidder</u>". The Debtors shall afford each Qualified Bidder due diligence access to the Debtors' businesses and assets, which diligence may include access to the Data Room, management presentations and site visits, and such other diligence which Potential Bidders may request and to which the Debtors, in their discretion, may agree, <u>provided</u>, <u>however</u>, that the Debtors shall have no obligation to provide due diligence access to any Qualified Bidder after the Bid Deadline (as defined below). The Debtors will designate an employee or other representative to coordinate all reasonable requests for additional information and due diligence access for Qualified Bidders.

## Bid Deadline

The deadline for submitting bids by a Qualified Bidder shall be June __, 2009 at 9:00 a.m. (Eastern time) (the "<u>Bid Deadline</u>"). A bid received after the Bid Deadline shall not constitute a Qualified Bid (as defined below).

No later than the Bid Deadline, a Qualified Bidder that desires to make an offer to acquire the Purchased Assets described above, (a "<u>Bid</u>") shall deliver written copies of its Bid to the Notice Parties by the Bid Deadline. The Debtors shall transmit copies of all Bids to counsel for the Creditors' Committee, if appointed, the Lender and Elitech via facsimile, hand-delivery, overnight mail, or electronic mail, immediately after receipt.

## Determination Of Qualified Bid Status

To be eligible to participate in the bidding process each prospective Qualified Bidder must deliver a written Bid to the parties identified immediately above so to be received by the Bid Deadline, <u>and that complies with each of the following conditions</u>:

Marked Purchase Agreement: A Bid shall be in the form of a black-lined copy of the Purchase Agreement showing the changes requested by the Bidder, including those related to the Purchase Price and other material terms such that the Debtors in the reasonable exercise of their business judgment, in consultation with the Creditors Committee and the Lender, may determine how such Bid compares to the terms of the Purchase Agreement.

Assets: The Debtors are considering Bids for the Purchased Assets. Prospective Qualified Bidders may submit a "joint bid" for the Purchased Assets, provided, however, that the identity of each Person participating in such "joint bid" must be disclosed in the Bid, and such "joint bid" shall be subject to section 363(n) of the Bankruptcy Code.

Conditions/Contingencies: A Bid shall NOT be subject to material conditions or contingencies to closing, including without limitation obtaining financing, internal approvals or further due diligence.

Authorization: A Bid shall include evidence of authorization and approval from such Qualified Bidder's board of directors or governing body with respect to the submission, execution, delivery and closing.

Good Faith Deposit: Except for Elitech, BCC and the Lender, each Bid shall be accompanied by a good faith deposit in the amount of 10% of the cash consideration in each Bid in the form of a certified check or other form acceptable to the Debtors in their discretion. Each good faith deposit will be deposited and held in Ashby & Geddes' escrow account.

Minimum Bid Requirement For Purchased Assets: Each Qualified Bidder's Bid to acquire the Purchased Assets shall have an initial minimum bid requirement equal to the sum of: (i) the Purchase Price; (ii) the Break-Up Fee; (iii) the Expense Reimbursement; and (iv) the proposed Overbid Increment in the amount of $300,000.00 (the aggregate of such amounts is referred to herein as the "Minimum Initial Bid").

Other Evidence: Each Bid must contain evidence satisfactory to the Debtors, in consultation with the Creditors Committee and the Lender, that the bidder is reasonably likely (based upon availability of financing, experience and other considerations) to be able to timely consummate a sale transaction if selected as the Successful Bidder (as defined below).

Irrevocable: A Bid must be irrevocable until two (2) business days after the closing of the sale or sales pursuant to an order of the Bankruptcy Court that is no longer subject to appeal.

A Bid received from a Qualified Bidder on or before the Bid Deadline that meets the above requirements, in the Debtors' discretion, in consultation with the Creditors Committee and the Lender, shall constitute a qualified bid ("Qualified Bid"). In the event a Bid is determined not to be a Qualified Bid, such Bidder shall be refunded its Good Faith Deposit within three (3) business days of that determination.

The Stalking Horse Purchaser is a Qualified Bidder and the Purchase Agreement is a Qualified Bid. For purposes of the Auction BCC is also a Qualified Bidder by reason of its interests related to the Purchase Agreement. Notwithstanding anything to the contrary in this Motion or the Bid Procedures, the Lender shall also be deemed a Qualified Bidder.

## Bid Protections

The Debtors have agreed to pay the Stalking Horse Purchaser the Break-Up Fee and the Expense Reimbursement in accordance with the terms and conditions set forth in the Purchase Agreement.

## "As Is Where Is"

The sale of the Debtors' assets that are the subject of this Motion shall be on an "as is, where is" basis without representations or warranties of any kind or nature, except to the extent set forth in the respective definitive purchase agreement(s) with the Successful Bidder. Except as may be set forth in the definitive purchase agreement(s), any and all of the Debtors' assets shall be sold free and clear of any and all liens, claims, encumbrances, restrictions, charges and encumbrances of any kind or nature to the fullest extent permissible under the Bankruptcy Code, with such to attach to the net proceeds of sale in their order of priority as set forth herein.

## Auction

The Debtors shall conduct an auction (the "Auction") to determine the highest and best bid for the Purchased Assets beginning at 10:00 a.m. (Eastern time) on June __, 2009 at the offices of Ashby & Geddes, P.A., 500 Delaware Avenue, 8th Floor, Wilmington, Delaware 19801, or at such later time and at such other place as the Debtors shall notify all Qualifying Bidders and all other persons entitled to attend the Auction.

In the event the Debtors do not receive by the Bid Deadline at least one Qualified Bid for the Purchased Assets, other than the Purchase Agreement, the Debtors will report the same to the Bankruptcy Court and seek approval of the sale of the Purchased Assets to the Stalking Horse Purchaser pursuant to the Purchase Agreement at the Sale Hearing.

Only the Debtors, Qualified Bidders, the Creditors Committee, the Lender, and such other persons expressly invited by the Debtors, including in each case their respective advisors, will be permitted to attend the Auction. The Debtors and their advisors shall direct and preside over the Auction, in consultation with the Creditors Committee and the Lender.

At the opening of the Auction, the Debtors shall announce the then highest and best bid for the Purchased Assets (the "Baseline Bid"), and the manner in which bidding on the Purchased Assets will proceed at the Auction. Bidding thereafter shall be made on an open basis, on the record of the Auction, and all material terms of each successive Bid shall be fully disclosed to all other Qualified Bidders (including the Stalking Horse Purchaser and the Lender) present at the Auction.

The Debtors may announce at the Auction such additional rules that they believe reasonable and necessary to maximize the value of their estates, so long as such rules are not inconsistent with the Bid Procedures.

## Bidding Increments

Each Bid made at the Auction for the Purchased Assets following announcement of the Baseline Bid will be in increments of $300,000 ("Overbid Increment"); provided however, that if the Baseline Bid is not the Stalking Horse Bid, such Baseline Bid must be at least $27.235 million.

An Overbid made by a Qualified Bidder must remain open and binding on the Qualified Bidder until and unless the Debtors accept a higher Qualified Bid as an Overbid. The Debtors shall announce at the Auction the material terms of each Overbid and the basis for calculating the total consideration offered in each such Overbid.

## Closing The Auction

At the conclusion of the bidding, the Debtors, following consultation with the Creditors Committee and the Lender, shall determine in the exercise of the Debtors' judgment the highest and best bid, (the "Successful Bid"). Such exercise of judgment must include consideration of the Debtors' obligation to pay Elitech the Breakup Fee and the Expense Reimbursement if Elitech has not made the highest bid. The Debtors reserve the right, in consultation with the Lender and the Creditors Committee, to select the next highest or otherwise best offer after the Successful Bid as a back-up bid (the "Back-Up Bid") for the Purchased Assets.

In the event the Successful Bidder fails to close the sale as a result of the Successful Bidder's default or breach under the applicable purchase agreement by the closing dates specified in such purchase agreement, the Debtors: (a) shall retain the Successful Bidder's Good Faith Deposit as liquidated damages; and (b) be authorized but not required to consummate a Back-Up Bid with the Back-Up Bidder without further notice or order of the Bankruptcy Court.

## Sale Hearing

The Debtors shall seek approval of the Successful Bid at the Sale Hearing to be conducted by the Bankruptcy Court on June __, 2009, or on such date as may be established by the Bankruptcy Court. The Debtors will not have accepted the Successful Bid unless and until the Bankruptcy Court has approved the Successful Bid at the Sale Hearing and entered the Sale Order.

## Return of Good Faith Deposit

Good Faith Deposits of the Successful Bidders shall be applied to the purchase price of such transaction at Closing. The Good Faith Deposit of the Back-up Bidder shall be held in a interest-bearing account until five (5) days after the Closing of the transactions contemplated by the Successful Bid, and thereafter returned to the Back-up Bidder. Good Faith Deposits of all other Qualified Bidders shall be held in an interest-bearing escrow account until no later than two (2) business days after the Sale Hearing, and thereafter returned to the respective bidders. If a Successful Bidder or the Back-up Bidder, as appropriate, fails to consummate an approved sale because of a breach or failure to perform on the part of such Bidder, the Debtors shall be entitled

to retain the Good Faith Deposit as part of its damages resulting from the breach or failure to perform by such Bidder.

<u>**Miscellaneous Provisions**</u>

The Debtors reserve the right, in their discretion, after consultation with the Creditors Committee and the Lender to modify the Bid Procedures as the Debtors deem appropriate to obtain the highest and best Bid for the Purchased Assets, so long as such modification is consistent with the terms hereof, including the Bid Procedures.

The Debtors, in their discretion, may, in consultation with the Creditors Committee and the Lender, (a) determine which Qualified Bid, if any, is the highest and best offer for the Purchased Assets, and (b) reject at any time before entry of the Sale Order any Bid that is (i) inadequate or insufficient, (ii) not in conformity with the requirements of the Bankruptcy Code or the Bid Procedures, or (iii) contrary to the best interests of the Debtors, their estates, and creditors.

The Debtors submit that implementation of the Bid Procedures will facilitate the bidding for the Purchased Assets. The Debtors do not believe that at this juncture, given their available liquidity and the need to sell their businesses on an expedited basis, the approval of the Bid Procedures will chill any bidding. Rather, the Debtors respectfully submit that approval of the Bid Procedures is in the best interests of the Debtors, their estates and their creditors in that it provides a structure and format for all potentially interested parties to equally formulate a bid for the Purchased Assets and participate in the sale process. Importantly, the Bid Procedures enable the Debtors to entertain Bids in order to ensure their estates and creditors receive the highest and best possible price.

## D.    *The Break-up Fee and Expense Reimbursement*

17.    The Debtors seek authorization to provide Elitech with a Break-Up Fee in the amount of approximately 3% of the Purchase Price (as defined in the Purchase Agreement), and to reimburse Elitech its actual out-of-pocket expenses reasonably incurred by Elitech in connection with the Sale up to $500,000 in accordance with the terms and conditions set forth in the Purchase Agreement. The Break-Up Fee and the Expense Reimbursement shall be paid as a carve out to, and free and clear of, the Encumbrances of the Lender and any secured creditors on the proceeds of such sale and shall constitute a superpriority administrative expense claim under sections 503(b) and 507 of the Bankruptcy Code. The Break-Up Fee and Expense

Reimbursement obligations of the Debtors to Elitech shall be taken into account in the Debtors' determination of the highest and best bid in each round of bidding at the Auction.

## E.  *Application of Purchase Price*

18.  The Sellers (as defined under the Purchase Agreement) shall apply the Purchase Price proceeds as follows:[4]

> (i)  First, the portion of the Purchase Price relating to the assets of the U.S. subsidiaries of Nanogen shall be applied (A) first, to satisfy the obligations of Nanogen (and Epoch/Nanotronics under that certain Guaranty dated August 14, 2008) to the Initial Bridge Note Holders under the Initial Bridge Notes, and (B) second, to satisfy the obligations of Nanogen (and Epoch/Nanotronics under that certain Guaranty dated August 14, 2008) to Elitech under the Additional Bridge Note (which allocation, if any, shall take the form of a credit bid, as described in Section 4.1 of the Purchase Agreement);

> (ii)  Second, the portion of the Purchase Price relating to the NAD Quotas (as defined in the APA) shall be applied (A) first, to satisfy the obligations of Nanogen (and Epoch/Nanotronics under that certain Guaranty dated August 14, 2008) to the Initial Bridge Note Investors under the Initial Bridge Notes, if any, and (B) second, to satisfy the obligations of Nanogen (and Epoch/Nanotronics under that certain Guaranty dated August 14, 2008) to Elitech under the Additional Bridge Note (which allocation, if any, shall take the form of a credit bid, as described Section 4.1 of the Purchase Agreement), and (C) third, to satisfy the obligations of Nanogen to the Holders under the 9.75% Convertible Notes; and

> (iii)  Third, the portion of the Purchase Price relating to the assets of Nanogen other than the NAD Quotas shall be applied (A) first, to satisfy the obligations of Nanogen to the Holders under the 9.75% Convertible Notes, if any, and (B) second, to satisfy the obligations of Nanogen (and Epoch/Nanotronics under that certain Guaranty dated August 14, 2008) to Elitech and the Initial Bridge Note Holders in respect of the Buyer Bridge Note and the Investor Bridge Notes, if any, each as applicable, which shall be applied pro rata among any such remaining obligations to Investors and Buyer.

## E.  *Notice of Auction and Sale Hearing, Bidding Procedures and Objection Deadlines*

19.  To facilitate the Bid Procedures, the Debtors respectfully request that the Court schedule the Sale Hearing at the convenience of the Court, no later than the week of June 22, 2009 and set the Bid Deadline and Auction in advance thereof.  Moreover, the Debtors

---

[4] To the extent defined terms are used in this paragraph 18 that are not defined herein, the definitions used in the Purchase Agreement shall apply.

respectfully request the Court approve the Auction and Sale Notice and the Cure Amount Notice, to be issued in connection with the proposed Sale, in substantially in the form of the notices attached as Exhibits 2 and 3 to the Bid Procedures Order.

### 1.    *The Auction and Sale Notice*

20.    Not later than three (3) days after the entry of the Bid Procedures Order, the Debtors will cause notice of the Auction and Sale Hearing, in a form substantially similar to the form attached to the Bid Procedures Order as Exhibit 2 (the "Auction and Sale Notice"), and a copy of the Bid Procedures Order approving the Bid Procedures in the form approved by this Court, to be sent by first-class mail, postage-prepaid, to (i) counsel to the Creditors Committee, or in the event no Creditors Committee is appointed, the creditors holding the 20 largest unsecured claims against the Debtors' estates; (ii) all entities that claim any interest in or lien on any of the Debtors' assets; (iii) all parties to executory contracts and unexpired leases which the Debtor may seek to assume and assign to the Successful Bidder; (iv) all governmental taxing authorities that have, or as a result of the sale of any of the Debtors' assets may have, claims, contingent or otherwise, against the Debtors; (v) all parties that filed requests for notices under Bankruptcy Rules 2002 and/or 9010(b); (vi) all interested governmental, pension, and environmental entities; (vii) the Office of the United States Trustee; (viii) the Lender; (ix) all entities which within the 12 months prior to the Petition Date have expressed to any of the Debtors an interest in purchasing any of the Purchased Assets; and (x) all equity security holders of the Debtors.

21.    In addition, not later than five (5) days after the entry of the Bid Procedures Order, the Debtors shall cause the Auction and Sale Notice to be published in the national edition of one of the following:  The Wall Street Journal, The New York Times, or The USA

Today, as to be determined by Debtors, pursuant to Bankruptcy Rule 2002(l). Such publication notice shall be sufficient and proper notice to any other interested parties, including those whose identities are unknown to Debtors.

**2.     *Assumption and Assignment of Executory Contracts and Unexpired Leases***

22.     To further facilitate the Sale, the Debtors will serve, via first class mail, a notice (the "Cure Amount Notice"), in a form substantially similar to the form attached to the Bid Procedures Order as Exhibit 3, not later than three (3) days after the entry of the Bid Procedures Order on each counterparty to an executory contract or unexpired lease which the Debtors may seek to assume and assign to the Stalking Horse Purchaser or the Successful Bidder for any of the Debtors' assets.

23.     The Debtors will attach to the Cure Amount Notice their calculation of the undisputed cure amounts that they believe must be paid to cure all defaults under all executory contracts and unexpired leases which may be assumed and assigned in connection with the Sale (the "Cure Cost"). If no amount is listed on the Cure Amount Notice, the Debtors believe that there is no Cure Cost. Unless the non-debtor party files an objection (the "Cure Amount Objection") to their scheduled Cure Cost by 4:00 p.m. (Eastern Time) five (5) business days prior to the date scheduled for the Sale Hearing, or such other date scheduled by the Court, and serves the objection, so that it is actually received before such deadline, upon: (a) counsel to the Debtors: Ashby & Geddes, P.A., 500 Delaware Avenue, 8th Floor, Wilmington, DE 19801, Attn: William P. Bowden, Esq. and Ricardo Palacio, Esq.; (b) counsel to the Creditors Committee, or in the event no Creditors Committee is appointed, the creditors holding the 20 largest unsecured claims against the Debtors' estates; (c) counsel to the Lender: Bingham McCutchen LLP, 399 Park Avenue, New York, NY 10022-4689, Attn: Jeffrey S. Sabin, Esq.

and R. Jeffery Black, Esq.; (d) counsel to the Stalking Horse Purchaser: Jackson Walker LLP, 901 Main Street, Suite 6000, Dallas, Texas 75202, Attn: Robert Richardson, Esq.; and (e) counsel to the Office of the United States Trustee: 844 King Street, Suite 2207, Lockbox 35, Wilmington, DE 19801, Attn: Jane Leamy, Esq., then the Debtors may assume and assign such contracts and leases to the Successful Bidder and such non-debtor party shall: (i) be forever barred from objecting to the Cure Cost and from asserting any additional cure or other amounts with respect to such contract or lease, and the Debtors shall be entitled to rely solely on the Cure Cost; (ii) be forever barred and estopped from asserting or claiming against the Debtors, the Stalking Horse Purchaser, BCC or any other Successful Bidder or any other assignee of the relevant contract or lease or any successor or assignee thereof that any additional amounts are due or defaults exist under such contract or lease; and (iii) be deemed to have consented to the assumption and assignment of each unexpired lease, license agreement or executory contract.

24.    Moreover, unless the non-debtor party files a Cure Amount Objection on a timely basis pursuant to and in accordance with the requirements set forth above, such non-debtor party shall be deemed to have been provided with adequate assurance of future performance under any assumed and assigned unexpired lease, license agreement or executory contract, and shall be forever barred from raising any defense, claim, or objection with respect to the assignment of such lease, license agreement or executory contract on account of the Successful Bidder financial condition.

25.    If a Cure Amount Objection is timely filed, the Cure Amount Objection must set forth:  (a) the basis for the objection; (b) with specificity, the amount the party asserts as the Cure Cost; and (c) appropriate documentation in support of the Cure Cost.

26.     Hearings on Cure Amount Objections (and objections to the adequate assurance of future performance under the contracts and leases to be assumed and assigned to the Successful Bidder, which must be raised in accordance with the procedures below) may be held (a) at the Sale Hearing, or (b) on such other date that the Debtors determine in their sole discretion or the Court directs; provided, however, that if a contract or lease is assumed and assigned, the Cure Cost asserted by the objecting party (or such lower amount as may be fixed by the Court) shall be deposited and held in a segregated account by the Debtors pending further order of this Court or mutual agreement of the parties.

27.     If an Auction is conducted, a notice identifying the Successful Bidder will be sent by overnight courier or facsimile to all parties to the executory contracts and leases identified for assumption and assignment within twenty four hours of the conclusion of the Auction.

28.     If the Stalking Horse Purchaser is not the Successful Bidder for the Purchased Assets, and such Successful Bidder is seeking to have certain executory contracts and unexpired leases assumed and assigned as part of its Bid, the Debtors will provide financial information for the Successful Bidder to all non-debtor parties to such contracts and leases immediately following the Auction via facsimile, overnight courier or electronic mail.

29.     The Debtors' decision to assume and assign executory contracts and unexpired leases shall be subject to Court approval and consummation of the Sale.  Absent consummation of the Sale, each of the executory contracts and unexpired leases shall neither be deemed assumed nor assigned and shall in all respects be subject to further administration under the Bankruptcy Code.

30.     Except to the extent otherwise provided in the Purchase Agreement, or the definitive purchase agreement with the Successful Bidder, the assignee of any executory contract

or unexpired lease which is assumed and assigned will not be subject to any liability to the counterparty of the assigned executory contract or unexpired lease that accrued or arose before the closing date, and the Debtors shall be relieved of all liability accruing or arising thereafter pursuant to section 365(k) of the Bankruptcy Code.

### 3. *The Sale Hearing and Objection Deadline*

31.     Subject to the Court's calendar, the Debtors respectfully request that the Sale Hearing be scheduled on or about the week of June 22, 2009, with an objection deadline for such Sale Hearing set for five (5) business days prior to the date scheduled for the Sale Hearing.

5.     32.     The Debtors request that objections, if any, to the Sale, including any objections based upon lack of adequate assurance of future performance under section 365(b)(1)(C) of the Bankruptcy Code, must:  (a) be in writing; (b) comply with the Bankruptcy Rules and the Local Bankruptcy Rules; (c) be filed with the Clerk of the Bankruptcy Court, and be served so as to be received no later than 4:00 p.m. (Eastern Time) on the day that is five (5) business days prior to the Sale Hearing upon:  (a) counsel to the Debtors:  Ashby & Geddes, P.A., 500 Delaware Avenue, 8th Floor, Wilmington, DE 19801, Attn:  William P. Bowden, Esq. and Ricardo Palacio, Esq.; (b) counsel to the Creditors Committee, or in the event no Creditors Committee is appointed, the creditors holding the 20 largest unsecured claims against the Debtors' estates; (c) counsel to the Lender:  Bingham McCutchen LLP, 399 Park Avenue, New York, NY 10022-4689, Attn:  Jeffrey S. Sabin, Esq. and R. Jeffery Black, Esq.; (d) counsel to the Stalking Horse Purchaser: Jackson Walker LLP, 901 Main Street, Suite 6000 Dallas, Texas 75202, Attn: Robert Richardson, Esq.; and (e) counsel to the Office of the United States Trustee: 844 King Street, Suite 2207, Lockbox 35, Wilmington, DE 19801, Attn:  Jane Leamy, Esq.

33.     In addition, the Debtors request that if the Stalking Horse Purchaser is not the Successful Bidder for the Purchased Assets, and such Successful Bidder is seeking to have certain contracts and leases assumed and assigned as part of the Sale, the non-debtor parties to such contracts and leases shall have until 4:00 p.m. on the day prior to the Sale Hearing to raise objections under section 365(b)(1)(C) of the Bankruptcy Code.  The failure of any person to timely file its objection shall be a bar to the assertion, at the Sale Hearing or thereafter, of any objection to the consummation of the Sale or the Debtors' assumption and assignment of any contract or lease, free and clear of any and all Encumbrances (other than permitted encumbrances provided for expressly in the Purchase Agreement or alternative purchase agreement entered into with the Successful Bidder).

## BASIS FOR RELIEF REQUESTED

*A.*     *The Bid Procedures, the Break-Up Fee and the Expense Reimbursement Ought To Be Approved*

34.     Section 105(a) of the Bankruptcy Code provides that the Court "may issue any order, process or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. §105(a).  As described above, approval of the Bid Procedures will greatly assist the Debtors in maximizing the value that they may obtain for the Sale.  Consequently, the Debtors respectfully submit that granting the requested relief is "appropriate" under the circumstances.

35.     Once the Debtors articulate a valid business justification, "[t]he business judgment rule is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company."  In re S.N.A. Nut Company, 186 B.R. 98 (Bankr. N.D. Ill. 1995) (internal quotation, citation omitted); In re Integrated Resources, Inc., 147 B.R. 650, 656

(S.D.N.Y. 1992); In re Johns-Manville Corp., 60 B.R. 612, 615-16 (Bankr. S.D.N.Y. 1986) ("a presumption of reasonableness attaches to a Debtor's management decisions.").

36.    Indeed, when applying the "business judgment" rule, courts show great deference to the debtor's decision-making.  See Summit Land Co. v. Allen (In re Summit Land Co.), 13 B.R. 310, 315 (Bankr. D. Utah 1981).  Thus, this Court should grant the relief requested in this Motion if the Debtors demonstrate a sound business justification therefore.  See Fulton State Bank v. Schipper (In re Shipper), 933 F.2d 513, 515 (7th Cir. 1991); Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063, 1071 (2d Cir. 1983); In re Delaware & Hudson Ry. Co., 124 B.R.169, 179 (D.D.C. 1991).

## 1.    The Bid Procedures Are Appropriate

37.    The Bid Procedures are designed to encourage competitive bidding in an orderly manner to maximize value for the Debtors' estates.  The proposed procedures contain terms typical for a process through which a Sale of this nature is consummated, and the adoption of the Bid Procedures represents a sound exercise of the Debtors' business judgment.

38.    As described in detail above, the Debtors have limited funding and resources available to them to sustain an extended stay in bankruptcy.  While the Debtors have undertaken efforts to reduce expenses and stabilize their business, the Debtors do not have the resources to continue operating beyond the period contemplated by Bid Procedures without additional funding, of which the Debtors have no assurance.  Absent a sale, the Debtors may be forced to cease operations, shut their doors and wind down their affairs, leaving employees without jobs and customers scrambling to find alternative sources of the Debtors' products.  For these reasons, the Debtors, in consultation with their professionals, have determined that the best option for

maximizing the value of their estates for the benefit of their creditors and other constituencies is through a sale process pursuant to the Bid Procedures.

39. The Debtors believe that the Bid Procedures establish the parameters under which the value of the Purchased Assets may be maximized at the Auction and the ensuing Sale Hearing. Such procedures will unquestionably increase the likelihood that the Debtors will receive the greatest possible consideration for such assets because they will ensure a competitive and fair bidding process.

### 2. The Break-Up Fee, Expense Reimbursement and Overbid Increment Are Appropriate

40. The Debtors submit that the Break-Up Fee, Expense Reimbursement and Overbid should be approved as they will encourage bidding rather than chill it. The use of bid protections such as those proposed by the Debtors have become an established practice in chapter 11 asset sale cases such as these because bid protections of this type enable a debtor to ensure a sale to a contractually committed purchaser at a price the debtor believes to be fair, while providing the debtor with the potential to obtain an even greater recovery through an auction process. The Third Circuit Court of Appeals has clarified the standard for determining the propriety of bid protections in the bankruptcy context. In Calpine Corp. v. O'Brien Envt'l Energy, Inc. (In re O'Brien Envt'l Energy, Inc.), 181 F.3d 527 (3d Cir. 1999), the Third Circuit held that even though bidding incentives are measured against a business judgment standard in non-bankruptcy transactions, the administrative expense provisions in section 503(b) of the Bankruptcy Code govern in the bankruptcy context. Accordingly, incentives such as the Break-Up Fee and Expense Reimbursement must provide a benefit to the Debtors' estates.

41. The O'Brien Court identified at least two scenarios in which incentives may provide a benefit to an estate. First, "if the assurance of a break-up fee promoted more

competitive bidding, such as by inducing a bid that otherwise would not have been made and without which bidding would have been limited." Id. at 537. Second, where offering bidding incentives serves as an inducement to a prospective bidder to research the value of the debtor and submit a bid that serves as a floor upon which other bidders can rely. Id. In that context, "the bidder may have provided a benefit to the estate by increasing the likelihood that the price at which the debtor is sold will reflect its true worth." Id.

42.    The Break-Up Fee and Expense Reimbursement are consistent with the standard articulated by the Third Circuit in O'Brien. Potential purchasers now have a bench mark against which to bid and will be able to submit their own adaption of the Purchase Agreement to make a bid. Likewise, the Debtors' estates have been benefited by the "floor" price established by the Stalking Horse Purchaser for the Purchased Assets in the Purchase Agreement. Additionally, the Debtors believe that providing these incentives to the Stalking Horse Purchaser will enhance the prospects for spirited bidding on the Purchased Assets.

43.    Moreover, the projected Break-up Fee, in terms of its percentage and amount, is well within the magnitude as break-up fees approved in other cases. See e.g., In re Global Home Products LLC, et al., Case No. 06-10340 (KG) (Bankr. D. Del. July 14, 2006) (order approving a break-up fee of $650,000 or 3.1% of purchase price of $21 million); In re Women First Healthcare, 332 B.R. at 118 (approving a break-up fee of $50,000 or 2.8% on the sale of assets worth $1.75 million); In re Decora Indus., Inc., 2002 WL 3233249 (D. Del. May 20, 2002) (Farnan, J.) (approving on appeal break-up fee of $625,000 or 3% of purchase price); In re Fruit of the Loom, Inc., Case No. 99-4497 (PJW) (Bankr. D. Del. Dec. 11, 2001) (approving a $25 million, or 3% of purchase price, break-up fee); In re Caldor, Inc. – NY, Case No. 95-B-44080

(JLG) (Bankr. S.D.N.Y. Feb. 4, 1999) (order approving break-up fees of $1,900,000 on purchase price of $75,735,000 and $3,550,000 on purchase price of $142,000,000 or approximately 2.5%).

44. Finally, the overbid increment requirements described in the Bid Procedures are appropriate under the circumstances as well. The Debtors submit that they reflect rather modest minimum overbid requirements given the magnitude, complexity and scope of the Debtors' businesses and assets, and the Debtors believe that it is unlikely to deter serious bidders. Consequently, the Debtors believe the overbid requirement is appropriate.

45. Absent authorization of the Break-Up Fee, the Expense Reimbursement and the Overbid Increment, the Debtors may lose the opportunity to obtain the highest and best offer for the Purchased Assets. If the protections are not approved, the Stalking Horse Purchaser may not go forward with the Sale.

46. Accordingly, the Debtors request that the Court approve the Bid Procedures, and authorize the payment of the Break-up Fee and Expense Reimbursement.

**B.** ***The Sale of the Debtors' Assets is Within the Sound Business Judgment of the Debtors and Should be Approved***

47. Section 363(b)(1) of the Bankruptcy Code provides, in relevant part, that a debtor in possession, "after notice and hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). Section 363 of the Bankruptcy Code does not set forth a standard for determining when it is appropriate for a court to authorize the sale or disposition of a debtor's assets prior to confirmation of plan. However, courts in this Circuit and others have required that the decision to sell assets outside the ordinary course of business be based upon the sound business judgment of the debtors. See In re Abbotts Dairies of Pennsylvania, Inc., 788 F2d. 143 (3d Cir.1986); see also Myers v. Martin (In re Martin), 91 F.3d 389, 395 (3d Cir. 1996); Lionel Corp., 722 F.2d at 1071; Dai-Ichi Kangyo Bank, Ltd. v.

Montgomery Ward Holding Corp., (In re Montgomery Ward Holding Corp.), 242 B.R. 147, 153 (D. Del. 1999); Delaware & Hudson, 124 B.R. at 176.

48.     The "sound business judgment" test requires a debtor to establish four elements in order to justify the sale or lease property outside the ordinary course of business, namely, (a) that a "sound business purpose" justifies the sale of assets outside the ordinary course of business, (b) that adequate and reasonable notice has been provided to interested persons, (c) that the debtors have obtained a far and reasonable price, and (d) good faith. Abbotts Dairies, 788 F.2d 143; Titusville Country Club v. Pennbank (In re Titusville Country Club), 128 B.R. 396, 399 (Bankr. W.D. Pa. 1991); In re Sovereign Estates, Ltd., 104 B.R. 702, 704 (Bankr. E.D. Pa. 1989). In this case, the Debtors submit that the decision to proceed with the sale of the Debtors' assets, and the Bid Procedures related thereto, are based upon their sound business judgment and should be approved. A debtors' showing of a sound business purpose need not be unduly exhaustive but, rather, a debtor is "simply required to justify the proposed disposition with sound business reasons." In re Baldwin United Corp., 43 B.R. 888, 906 (Bankr. S.D. Ohio 1984). Whether or not there are sufficient business reasons to justify a transaction depends upon the facts and circumstances of each case. Lionel Corp., 722 F.2d at 1071; Montgomery Ward, 242 B.R. at 155 (approving funding of employee incentive and severance program; business purpose requirement fulfilled because stabilizing turnover rate and increasing morale were necessary to successful reorganization).

49.     Additionally, section 105(a) of the Bankruptcy Code provides a bankruptcy court with broad powers in the administration of a case under the Bankruptcy Code. Section 105(a) provides that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of the Bankruptcy Code". 11 U.S.C. §105(a). Provided

that a bankruptcy court does no employ its equitable powers to achieve a result not contemplated by the Bankruptcy Code, the exercise of its section 105(a) power is proper. In re Fesco Plastics Corp., 966 F.2d 152, 154 (7th Cir. 1993); Pincus v. Graduate Loan Ctr. (In re Pincus), 280 B.R. 303, 312 (Bankr. S.D.N.Y. 2002). Pursuant to section 105(a), a court may fashion an order or decree that helps preserve or protect the value of a debtors' assets. See, e.g., Chinichian v. Campolongo (In re Chinichian). 784 F.2d 1440, 1443 (9th Cir. 1986) ("Section 105 sets out the power of the bankruptcy court to fashion orders as necessary pursuant to the purposes of the Bankruptcy Code."): In re Cooper Pros. Liquidating Trust, Inc., 61 B.R. 531, 537 (Bankr. W.D. Tenn. 1986) (notice that bankruptcy court is "one of equity and as such it has a duty to protect whatever equities a debtor may have in property for the benefit of its creditors as long as that protection is implemented in a manner consistent with the bankruptcy laws").

50.     The Debtors submit that more than ample business justification exists to sell the Purchased Assets to Elitech (or the Successful Bidder). For the reasons set forth above. the Debtors believe that it is essential to sell their assets promptly. Simply put, given the circumstances facing the Debtors as a result of their liquidity position, it is necessary to promptly sell their assets to avoid deterioration in their value. The Debtors believe that the Bid Procedures and the Auction will generate interest and bidding, and the bidding process will yield the highest and best bid for the Debtors' Purchased Assets. Accordingly, the Debtors believe that the relief sought by this Motion is not only reasonable, but necessary, to maximize the value of the Debtors' estates for the benefit of their stakeholders.

51.     The notice described herein and the Bid Procedures are designed to provide adequate notice to all potentially interested parties, including those who have previously

expressed an interest in purchasing any of the Debtors' assets. Accordingly, the proposed Sale satisfies the second prong of the <u>Abbotts Dairies</u> standard.

52.     Moreover, the Bid Procedures are designed to maximize the value received for the Debtors' assets. The process proposed by the Debtors allows for a timely auction process, given the circumstances currently facing the Debtors, while providing bidders with sufficient time and diligence to submit a timely bid. The Bid Procedures are designed to ensure that the Purchased Assets will be sold for the highest or otherwise best possible purchase price under the circumstances. The proposed sale of the Purchased Assets to the Stalking Horse Purchaser will be further subject to a market check through the solicitation of competing bids in a court-supervised Auction process as set forth in the Bid Procedures. Additionally, the Debtors and all parties in interest can be assured that the consideration received for the Purchased Assets will be fair and reasonable, and the third prong of the <u>Abbotts Dairies</u> standard will be satisfied.

## C.     *The Sale is Proposed in "Good Faith" Under Section 363(m) of the Bankruptcy Code*

53.     The Debtors request that the Court find that the Stalking Horse Purchaser or the Successful Bidder for the Purchased Assets (or any Back-Up Bidder) is entitled to the benefits and protections provided by section 363(m) of the Bankruptcy Code in connection with the Sale.

54.     Section 363(m) of the Bankruptcy Code provides, in pertinent part:

> The reversal or modification on appeal of an authorization under subsection b)…of this section of sale… of property does not affect the validity of a sale…under such authorization to an entity that purchased…such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale ….were stayed pending appeal.

11 U.S.C. § 363(m)

55.     Section 363(m) of the Bankruptcy Code thus protects the purchaser of assets sold pursuant to section 363 of the Bankruptcy Code from the risk that it will lose its interest in the

purchased assets if the order allowing the sale is reversed on appeal. By its terms, section 363(m) of the Bankruptcy Code applies to sales of interest in tangible assets, such as the Purchased Assets. Additionally, the Third Circuit has indicated that section 363(m) of the Bankruptcy Code also protects the assignee of a debtor's interest in executory contracts under Bankruptcy Code section 365. Krebs Chrysler-Plymouth, Inc. v. Valley Motors, Inc., 141 F.3d 490, 497-98 (3d. Cir. 1998). In Krebs, the Court considered "whether assignments of [certain automobile dealerships] franchises under section 365 are also sales of estate property subject to section 363(m)." Id. at 497. Despite the absence of an explicit reference to assignments of executory contracts under section 365 of the Bankruptcy Code, the Court in Krebs concluded that section 363(m) of the Bankruptcy Code protected an assignment of a debtor's interest in certain automobile franchise agreements pursuant to an auction sale. Like the franchise agreements protected in Krebs, the executory contracts and unexpired leases which may be assumed and assigned in connection with the Sale may be assumed and assigned pursuant to section 365 of the Bankruptcy Code. In light of Krebs, the Debtors respectfully submit section 363(m) applies to protect the Stalking Horse Purchaser and any Successful Bidder (or the Back-Up Bidder) for the Purchased Assets with respect to both executory contracts and leases.

56. Although the Bankruptcy Code does not define "good faith purchaser", the Third Circuit, construing section 363(m) of the Bankruptcy Code, has stated that "the phrase encompasses one who purchases in 'good faith' and for 'value'." Abbotts Dairies, 788 F.2d at 147. To constitute lack of good faith, a party's conduct in connection with the sale must usually amount to "fraud, collusion between the purchaser and other bidders or the trustee of an attempt to take grossly unfair advantage of other bidders." Id. (citing In re Rock Indus. Mach. Corp., 572 F.2d 1195, 1198, (7th Cir. 1978)); see also In re Bedford Springs Hotel, Inc., 99 B.R. 302, 305

(Bankr. W.D. Pa. 1989); In re Perona Bros., Inc., 186 B.R. 833, 839 (D.N.J. 1995). Due to the absence of a bright line test for good faith, the determination is based on the facts of each case, concentrating on the "integrity of [an actor's] conduct during the sale proceedings." In re Pisces Leasing Corp., 66 B.R. 671, 673 (E.D.N.Y. 1986) (quoting Rock Indus., 572 F.2d at 1998.

57.     Here, the sale of the Purchased Assets and the assignment of executory contracts and leases designated by the Successful Bidder will be in good faith. The record made at the Sale Hearing will demonstrate the absence of fraud or collusion in connection with the sale of the Purchased Assets, and the assignment of executory contracts and leases in connection therewith. To the contrary, as discussed throughout this Motion, and as will be confirmed at the Sale Hearing, the Purchase Agreement (or the comparable asset purchase agreement with the Successful Bidder) will be the culmination of a solicitation and negotiation process in which all parties will be represented by counsel. All negotiations have been and will continue to be conducted on an arms length, good faith basis. With respect to the potential bidders, the Bid Procedures are designed to ensure that no party is able to exert undue influence over the process. Moreover, the identities of the parties participating in the bidding will be disclosed to the Debtors, the Creditors Committee, the Lenders and the Court, and such bids are subject in all respects to section 363(n) of the Bankruptcy Code. Under the circumstances, the Successful Bidder (or Back Up Bidder) should be afforded the protections that section 363(m) of the Bankruptcy Code provides to a good faith purchaser. Furthermore, the Bid Procedures are designed to prevent potential bidders from engaging in any conduct that would cause or permit the sale of the Debtors' Purchased Assets to be avoided under section 363(n) of the Bankruptcy Code.

58.     All parties-in-interest will receive notice of the Bid Procedures, the Auction, and the Sale Hearing and afforded an opportunity to be heard.  Additionally, all counterparties to executory contracts and leases will be provided notice of the potential assumption and assignment of their agreements and an opportunity to be heard.  The Debtors submit that such notice is adequate for entry of an order or orders approving the sale of the Purchased Assets, and satisfies the requisite notice provisions required under sections 363(b) and 365 of the Bankruptcy Code.

**D.     *The Sale Will Satisfy the Requirements of Section 363(f) of the Bankruptcy Code***

59.     Subject to the entry and terms and conditions of an order approving the Sale and the terms and conditions of any Order authorizing the use of cash collateral, the Debtors propose to sell, assign and transfer title to their assets free and clear of liens, claims, charges, security interests, restrictions and encumbrances of any kind or nature (collectively, "Encumbrances") to the fullest extent permitted by the Bankruptcy Code, with such Encumbrances to attach to the net proceeds of the Sale, if any.

60.     Under section 363(f) of the Bankruptcy Code, a debtor-in-possession may sell all or any part of its property free and clear of any and all liens, claims or interests in such property if:  (i) such a sale is permitted under applicable non-bankruptcy law; (ii) the party asserting such lien, claim or interest consents to such sale; (iii) the interest is a lien and the purchase price for the property is greater than the aggregate amount of all liens on the property; (iv) the interest is subject of a *bona fide* dispute; or (v) the party asserting the lien, claim or interest could be compelled, in a legal or equitable proceeding, to accept a money satisfaction for such interest. 11 U.S. C. § 363(f); Citicorp Homeowners Serv., Inc. v. Elliot (In re Elliot), 94 B.R. 343, 345 (E.D. Pa. 1988) (notice that section 363(f) of the Bankruptcy Code is written in the disjunctive; therefore, a court may approve the sale "free and clear" provided at least one of the subsections

is met). The Debtors expect that they will satisfy the second and fifth of these requirements, if not others as well, warranting approval of the sale of the Debtors' Purchased Assets free and clear of all Encumbrances. Indeed, courts have held that they have the equitable power to authorize sales free and clear of interests that are not specifically covered by section 363(f). See, e.g., In re Trans World Airlines, Inc., 2001 WL 1820325 at **3, 6 (Bankr. D. Del. March 27, 2001); Volvo White Truck Corp. v. Chambersburg Beverage, Inc. (In re White Motor Corp.), 75 B.R. 944, 948 (Bankr. N.D. Ohio 1987).

**E.     The Assumption and Assignment of Executory Contracts and Unexpired Leases Should be Approved**

61.     To facilitate and effectuate the sale of the Debtors' Purchased Assets, the Debtors seek authority to assume and assign various executory contracts and unexpired leases related thereto to the Successful Bidder (or Back Up Bidder) to the extent required. Section 365 of the Bankruptcy Code authorizes a debtor to assume and/or assign its executory contracts and unexpired leases, subject to the approval of the Bankruptcy Court, provided that the defaults under such contracts and leases are cured and adequate assurance of future performance is provided. A debtor's decision to assume or reject an executory contract or unexpired lease must only satisfy "business judgment rule" and will not be subject to review unless such decision is clearly an unreasonable exercise of such judgment. Group of Institutional Investors v. Chicago, Milwaukee, St. Paul & Pacific Ry. Co., 318 U.S. 523 (1943) (applying Bankr. Act Section 77 subsection (b), the predecessor to Bankruptcy Code section 365 (rejecting the test of whether the executory contract was burdensome in favor of whether rejection is within the debtor's judgment); Lubrizol Enter, Inc. v. Richmond Metal Finishers, Inc., 756 F.2d 1043, 1046-47 (4th Cir. 1985).

62.     It is well settled that the meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given "practical, pragmatic construction." See Carlisle Homes, Inc. v. Azzari (In re Carlisle Homes, Inc.), 103 B.R. 525, 538 (Bankr. D.N.J. 1989).   Among other things, adequate assurance may be given by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned.   In re Bygaph, Inc., 56 B.R. 596, 605-6 (Bankr. S.D.N.Y. 1986) (finding adequate assurance of future performance present when the prospective assignee of a lease from the debtors has the financial resources and has expressed a willingness to devote sufficient funding to the business in order to give it a strong likelihood of succeeding; "chief determinant of adequate assurance of future performance is whether rent will be paid.").

63.     The Successful Bidder (or Back Up Bidder) for the Debtors' Purchased Assets may desire to take assignment of certain executory contracts and unexpired leases related thereto. To the extent executory contracts and leases are identified for assumption and assignment, the Debtors believe that they can and will demonstrate that all requirements for assumption and/or assignment will be satisfied at the Sale Hearing.   The Debtors, as required by the Bid Procedures, will evaluate the financial wherewithal of all potential bidders before qualifying such bidders to bid.   Further, for the reasons stated throughout this Motion, the Debtors, in the exercise of their sound business judgment, believe that selling their assets, and assuming and assigning the selected executory contracts and leases attendant to the operation of those businesses will be in the best interests of their estates.

64.     If an Auction is conducted, a notice identifying the Successful Bidder will be sent by overnight courier or facsimile to all parties to the executory contracts and leases identified for assumption and assignment within twenty-four (24) hours of the conclusion of the Auction.   At

that point, such parties may object solely on the issues of whether such Successful Bidder can provide adequate assurance of future performance as required by Section 365 of the Bankruptcy Code. If any party has timely asserted an objection to the sufficiency of assurance of future performance by the proposed assignee and such objection has not been withdrawn or resolved by the date of the Sale Hearing, the Debtors request that this Court conduct a further hearing on such adequate assurance objections.

65.     Thus, the Debtors request that assumption and assignment of the executory contracts and leases which are designated for assumption and assignment by the Successful Bidder should be approved.

**F.      *Relief from the Ten Day Waiting Periods Under Bankruptcy Rule 6004(h) and 6006(d) is Appropriate***

66.     Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property . . . .is stayed until expiration of 10 days after entry of the order, unless the court orders otherwise." Similarly, Bankruptcy Rule 6006(d) provides that an "order authorizing the trustee to assign an executory contract or expired lease . . . is stayed until the expiration of 10 days after the entry of the order, unless the court orders otherwise." The Debtors request that the Sale Order, upon its entry, be effective immediately by providing that the ten (10) day stays under Bankruptcy Rules 6004(h) and 6006(d) are waived.

67.     The purpose of Bankruptcy Rules 6004(h) and 6006(d) is to provide sufficient time for an objecting party to appeal before an order can be implemented. See Advisory Committee Notes to Fed. R. Bankr. P 6004(h) and 6006(d). Although Bankruptcy Rules 6004(h) and 6006(d) and the Advisory Committee Notes are silent as to when a court should "order otherwise" and eliminate or reduce the ten (10) day stay period, COLLIER ON BANKRUPTCY suggests that the ten (10) day stay period should be eliminated to allow a sale or other transaction

to close immediately "whether there has been no objection to the procedure." 10 COLLIER ON BANKRUPTCY ¶ 6064.09 (L. King, 15th rev. ed. 1988). Furthermore, Collier's provides that if an objection is filed and overruled, and the objecting party informs the court of its intent to appeal, the stay may be reduced to the amount of time actually necessary to file such appeal. Id.

68.     Accordingly, the Debtors hereby request that the Court waive the ten (10) day stay period under Bankruptcy Rules 6004(h) and 6006(d).

## NOTICE

69.     The Debtors propose to give notice of this Motion to: (i) the Office of the United States Trustee for the District of Delaware; (ii) counsel to the Lenders; (iii) creditors holding the twenty (20) largest unsecured claims against the Debtors' estates (on a consolidated basis); and (iv) those parties requesting notice pursuant to Bankruptcy Rule 2002, in accordance with Del. Bankr. L.R. 2002-1(b). In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is necessary.

**WHEREFORE**, the Debtors respectfully request that the Court: (i) enter an order, substantially in the form attached hereto as Exhibit A, approving the Bid Procedures; (ii) enter an order, substantially in the form annexed as Exhibit B hereto, approving the sale of the Purchased Assets to the highest and best Bidder consistent with this Motion; and (iii) granting such other and further relief as the Court deems just and proper.

Dated: May 13, 2009
Wilmington, Delaware

**ASHBY & GEDDES, P.A.**

_____

William P. Bowden (I.D. No. 2553)
Ricardo Palacio (I.D. No. 3765)
Karen B. Skomorucha (I.D. No. 4759)
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, Delaware 19899
Tel: (302) 654-1888
Fax: (302) 654-2067

_Proposed Counsel for the Debtors and Debtors in Possession_